## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **ROBERT A DOANE,** ) | **CIVIL #. 1:19-CV-00111-MLB** |
| ) | |
| **Plaintiff** ) | |
| **v.** ) | |
| ) | |
| **TELE CIRCUIT NETWORK, CORP.** ) | |
| **Et al.** ) | |
| ) | |
| **Defendants** ) | |

### PLAINTIFF'S BRIEF IN SUPPORT OF SUBJECT MATTER JURISDICTION
### (with request for evidentiary hearing endorsed hereon)

Now comes Plaintiff, **ROBERT A. DOANE**, by and through undersigned

counsel, and in accordance with this Court's Order of July 28, 2022, and hereby

submits his initial brief in support of the proposition that Plaintiff has satisfied the

amount in controversy requirement.

### STATEMENT OF THE CASE

**A.    Facts Giving Rise to Plaintiff's Claims[1]**

---

[1] Plaintiff has provided his declaration herewith verifying under oath the factual
averments contained in this section.

1

Plaintiff is the trustee of several trusts and is the primary caretaker and, at the time of the acts complained of, was the power of attorney for his two elderly parents, and stepmother who was suffering from dementia.  Plaintiff has also been diagnosed with, and suffers from, chronic pain resulting from injuries to his cervical spine and shoulder, and has also been diagnosed with and suffers from sleep disorders and as a result often sleeps random hours throughout the day.

At all times relevant, Plaintiff owned and maintained a cellphone with the number of 781-245-6577—a number associated with his household since he was a child, and which – due to his interest in maintaining his privacy and to not be interrupted in his day-to-day affairs – he had, over a decade ago, registered to a "do not call list" maintained by the Federal Trade Commission[2].

On April 26, 2017, at about 6:36 PM, a call was received by Plaintiff on his cellphone from 251-867-6185.  This person claimed, albeit incorrectly, to have received a call from Plaintiff.  About a half hour later, a call was received on Plaintiff's cellphone from 713-670-9730 from another person erroneously accusing Plaintiff of having called them.  That evening, several more calls were received from various different persons from several different states alleging, in many instances quite angrily, that they received calls from Plaintiff.  The gravity of the

---

[2] Plaintiff's family and friends associate Plaintiff with his cellphone number and Plaintiff's elderly parents, who can easily remember this number, relied on it to contact Plaintiff on daily basis.

situation, which Plaintiff found highly concerning, made it was difficult for Plaintiff to sleep that night.

The next morning, Plaintiff's cellphone became completely inundated with calls from irate persons from multiple states claiming they received unwelcomed and harassing calls from Plaintiff. The callers uniformly reported that their caller identifications displayed "Doane Robert 781-245-6577." Plaintiff answered as many of these calls as possible and attempted to explain that no calls were made by Plaintiff and that apparently someone was using Plaintiff's name and number without his knowledge or permission. As the day progressed, calls by those believing Plaintiff had called and harassed them increased in frequency. During this period, Plaintiff received numerous voicemails accusing Plaintiff of having made multiple calls to the same household, informing Plaintiff that the recipients of the calls were on the do-not-call list and that such calls were therefore illegal, threatening to harm Plaintiff, threatening to sue Plaintiff, threatening to report Plaintiff to the police and the FBI, and in some instances, that Plaintiff had in fact already been reported. There were so many calls and voicemails that Plaintiff's voicemail software began behaving erratically, causing the voicemail recordings to become garbled and inaudible making it impossible to distinguish between callers that would need to be addressed, such as those threatening to sue or report Plaintiff to the authorities, and those that did need to be promptly addressed. By Friday,

April 28, 2017, after becoming exhausted and utterly distressed, it became necessary for Plaintiff to silence his phone as it became clear to Plaintiff that his efforts to explain to every caller that he was not in fact responsible for the calls was unmanageable, if not impossible.

Upon review of some of the audible voicemails, it was discovered that several callers who had been asked by Plaintiff for assistance had called back and left messages.  In their messages the callers reported that the telemarketers who had used Plaintiff's name and number had foreign accents and were calling senior citizens on behalf of "Tele Circuit" attempting to sell products and/or services.  For example, Plaintiff received a report that a caller had received a voicemail message on April 27, 2017, at 4:33 PM, using Plaintiff's name and number from an agent who identified himself as "Sam Cash" from "Tele Circuit."  After the recipient of this call expressed interest, the agent provided a callback number of 887-835-3247, which was determined to be a working number for Tele Circuit.  By way of further example, Plaintiff received a report from another caller that a voicemail message was received by the caller on April 28, 2017, at 2:59 PM, displaying Plaintiff's name and number during which the agent claimed to be calling senior citizens on behalf of Tele Circuit to sell "reduced phone services from AT&T for $45.00 per month".

Following April 29, 2017, Plaintiff continued to receive calls from consumers in several states, including Texas, Florida, North Carolina, South Carolina, Alabama and Tennessee, who claimed that Plaintiff had unlawfully solicited them on behalf of Tele Circuit.  As result of the illegal spoofing of Plaintiff's name and number by Tele Circuit, hundreds of angry persons have attempted to call Plaintiff back believing they were called by Plaintiff, and over 130 voicemail messages were received by Plaintiff from these individuals before Plaintiff's voicemail became dysfunctional.  Since the callbacks do not represent the total number of individuals that were actually called using Plaintiff's name and number, it is estimated that the actual calls made in violation of the Telephone Consumer Protection Act ("TCPA") and the Massachusetts Telephone Solicitations Act ("MTSA") using Plaintiff's name and number are in the hundreds of thousands.

On May 8, 2017, Plaintiff sent Defendants a demand letter as required under M.G.L. c. 93A.  Within minutes of receipt of the letter, Syed called Plaintiff and angrily threatened Plaintiff.  Defendants did not otherwise respond to the demand letter.  Thereafter, on Mother's Day, May 14, 2017, while Plaintiff was visiting his own mother, Plaintiff received a call from an irate gentleman from Texas claiming that his mother had received several calls that displayed Plaintiff's name and number soliciting Tele Circuit's services during which inappropriate things were

said to the gentleman's mother.  This gentleman indicated that he was going to sue

Plaintiff and insinuated that he was going to come to Massachusetts and cause

Plaintiff physical harm.

As a direct result of Defendants' conduct, Plaintiff has suffered, and

continues to suffer, severe emotional distress with physical manifestations.

Specifically, the events, the stress, and the threats have caused him tension,

interference with sleep, exacerbation of his chronic pain and sleep disturbance,

caused increased daytime somnolence and required him to increase his medications

and supplements in an attempt to manage and alleviate these symptoms.  Plaintiff

has also been required to expend funds for attorney fees attempting to mitigate the

ongoing threat of harm and liability in connection with the subject spoofed calls.

Further, Plaintiff suffered monetary losses as a result of the Defendants' conduct,

ranging from the wear and tear on his cellphone, battery depletion and electricity

used for recharge, to the expense of software to track the calls of those angry

callers believing Plaintiff had called them.

**B.    Defendants' Illegal Operations[3]**

Tele Circuit, based in Duluth, Georgia, is a non-facilities based

interexchange carrier authorized by the Federal Communications Commission

---

[3] The facts contained in this section are alleged in Plaintiff's Second Amended
Complaint.

("FCC") to provide domestic and international long distance telecommunications services.  In addition to Defendants' operations in Georgia, Tele Circuit and Syed also have employees and facilities, including but not limited to call centers, in Pakistan which they utilize to conduct telemarketing on their behalf.  These call centers are financed, controlled, and directed by Defendants from the United States.

The purpose of Defendants' telemarketing activities is to fraudulently attempt to switch customers, predominately senior citizens, from their present telecommunication service provider to Tele Circuit by changing the preferred telecommunications service providers of consumers without proper authorization and by misleading consumers as to Tele Circuit's identity and the true nature of its offerings.  During these telemarketing efforts, including the subject campaign conducted using Plaintiff's name and number, the call centers utilized illegal voice over internet protocol ("VoIP") spoofing and devices that constitute automatic telephone dialing systems ("ATDS") to contact hundreds of thousands of consumers across the country.  As a result of the aforementioned telemarketing activities, Tele Circuit has received numerous complaints that Tele Circuit has changed consumers' telecommunication service provider without the consumers' permission.  These practices have led to multiple complaints to the FCC.

As a result of these practices, the FCC issued a Notice of Apparent Liability for Forfeiture ("Notice of Apparent Liability") against Tele Circuit for "willfully and repeatedly violating Section 201(b) and 258 of the Communications Act of 1934, as amended, and Sections 1.17 and 64.1120 of the Commission's rules". As the FCC indicated in the Notice of Apparent Liability, the FCC has "reviewed numerous complaints against Tele Circuit that consumers filed with the (FCC), state regulatory agencies, and the Better Business Bureau (BBB)." The FCC contends Tele Circuit "switched their (or their elderly relative's) long distance services from their preferred carrier to Tele Circuit without authorization, and/or charged them for service they did not request." These complaints were received by the FCC during the same time period that the Defendants spoofed Plaintiff's name and number.

At all relevant times, Syed owned a 100 percent interest in Tele Circuit, exercised exclusive and complete control over its operations and call centers. Specifically, Plaintiff has alleged that Syed has controlled all aspects of the operations of Tele Circuit's call centers, including hiring and firing of personnel, training, practices and procedures, the drafting and implementation of sales scripts and had actual responsibility for insuring that the call centers and Tele Circuit employees were compliant with federal and state telemarketing laws. Plaintiff has further alleged that Syed, directed, approved and ratified the use of Plaintiff's

name and number to "slam" and "cram" consumers in multiple states, and had full

knowledge of the harm that would be occasioned to Plaintiff as a result.

### C.   Procedural History

This matter, which was originally commenced in Massachusetts, has a

lengthy and very costly procedural history.  On September 18, 2017, Plaintiff filed

a complaint against Tele Circuit and its principal Syed in the United States District

Court for the District of Massachusetts ("Massachusetts District Court").

Following service, on April 16, 2018, Syed filed a motion to dismiss the amended

complaint for lack of personal jurisdiction and for failure to state a claim.

Thereafter, Plaintiff moved for leave to conduct jurisdictional discovery.  On June

28, 2018, while Syed's and Plaintiff's aforementioned motions were pending, Tele

Circuit filed for relief under Chapter 11 in the United States Bankruptcy Court for

the Northern District of Georgia ("Bankruptcy Court").  Plaintiff's lawsuit—

including the claims against Syed personally—were thereafter stayed by

Massachusetts District Court on July 13, 2018.

On September 28, 2018, Plaintiff submitted his Proof of Claim in the

Bankruptcy.  Following multiple court appearances, Plaintiff thereafter filed a

Motion for Relief from the Automatic Stay, Discretionary Abstention and to

Remand Claim to the United States District Court for the District of Massachusetts

on November 1, 2018.   A hearing was held on Plaintiff's Motion for Relief before

the Bankruptcy Court in Atlanta on November 8, 2018.  Following this hearing, the

Bankruptcy Court issued an Order on November 13, 2018, granting Plaintiff relief

from the automatic stay to pursue his lawsuit against both Tele Circuit and Syed

"provided that (Plaintiff) seeks to transfer the Lawsuit to the United States District

Court for the Northern District of Georgia."   Tele Circuit's bankruptcy was

thereafter dismissed on March 13, 2020.

Following receipt of the Bankruptcy Court's order, Plaintiff filed a motion in

the Massachusetts District Court to lift the stay and transfer venue to this Court on

December 7, 2018.  This motion was granted on January 2, 2019.  This action was

then transferred to this Court on January 7, 2019.

Following the transfer, Plaintiff filed his second amended complaint on May

1, 2019.  By way of the second amended complaint, Plaintiff sought damages in

excess of $500,000.00 against Defendants for the following: (1) violations of the

Telephone Consumer Protection Act; (2) violations of Truth in Caller ID Act; (3)

defamation; (4) invasion of privacy; (5) intentional infliction of emotional distress;

(6) violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93; and (7)

agency liability. (Id.).  As in Plaintiff's prior complaints, Plaintiff specifically

alleged that federal diversity jurisdiction existed.

Following the filing of the second amended complaint, Defendants thereafter filed motions to dismiss for failure to state a claim upon which relief could be granted. **Neither Defendant contested subject matter jurisdiction**.

On January 13, 2020, this Court dismissed Plaintiff's federal claims with prejudice by way of the following finding in a footnote:

> Plaintiff asserts that this Court also has diversity jurisdiction over the action, but it is clear to this Court that the amount in controversy requirement is not satisfied. A court may *sua sponte* raise a jurisdiction defect at any time.

Plaintiff timely appealed the January 13, 2020 decision of this Court by filing a notice of appeal on January 28, 2020. Following briefing, on March 24, 2021, the Court of Appeals vacated this Court's dismissal and remanded this case to this Court to further consider whether diversity jurisdiction exists over Plaintiff's state-law claims. Specifically, the Court of Appeals concluded as follows:

> We vacate the district court's dismissal of Plaintiff's state-law claims and remand for the court to determine in the first instance whether Plaintiff can prove by a preponderance of the evidence that the amount in controversy exceeds $75,000 for purposes of diversity jurisdiction.

This Court thereafter ordered the parties to brief this issue in accordance with Court of Appeal's mandate.

**D.    Attorney's Fees and Expenses**

11

As set forth in the Declaration of Richard B. Reiling Esq. ("Reiling Decl.") submitted herewith, Plaintiff has incurred the following attorney's fees in this matter:

A. Attorney's fees incurred in proceedings before the Massachusetts District Court:  $7,450.00 (29.8 hours at $250.00 per hour)

B. Attorney's fees incurred in proceedings before the Bankruptcy Court: $40,050.00 (160.2 hours at $250.00 per hour)

C. Attorney's fees incurred to date in proceedings before this Court: $14,275.00 (57.1 hours at $250.00 per hour).

D. Attorney's fees incurred in proceedings before the Court of Appeals: $10,875.00 (43.5 hours at $250.00 per hour).

**Attorney Fees**: $72,650.00

As likewise set forth in the Reiling Decl., Plaintiff has incurred the following expenses:

A. Local Counsel Attorney's Fees:  $4,325.00

B. Counsel Press[4] fees in proceedings before Court of Appeals: $5,913.20

C. Filing Fees: $856.00

---

[4] Counsel Press was employed to assist with the preparation of the brief, reply brief and to assemble the appendix.

D. Transcripts (hearings and depositions[5]):  $2,014.94

E.  Mailing Expenses:  $247.94

**Expenses**: $13,357.08

### **Total Attorney's Fees and Expenses**:  **$86,007.08**

Additionally, should this matter proceed to trial, it is anticipated that Plaintiff will

incur at least an additional $50,000.00 in attorney's fees and expenses.

### **SUMMARY OF THE ARGUMENT**

The federal courts determine the adequacy of a plaintiff's claim for damages

by using the rules established by the Supreme Court in *St. Paul Mercury Indem.*

*Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (plaintiff's claim for more than the

jurisdictional amount will generally be accepted if it appears that it was made in

good faith); see also *Fastcase, Inc. v. Lawriter*, 907 F. 3d 1335, 1342 (11th Cir.

2018).  The courts will only determine that an amount-in-controversy claim is not

made in good faith if it is legally certain that the plaintiff absolutely cannot exceed

the amount-in-controversy. *Id*.

As plainly set forth in the second amended complaint, as a result of

Defendants' outrageous conduct, Plaintiff suffered severe emotional distress with

physical manifestations.  Jurys have routinely awarded plaintiffs in invasion of

---

[5] Plaintiff conducted the 2004 examinations of Syed and Tele Circuit's former
CFO in June, 2019.

privacy cases with lesser showings of emotional injury well in excess of

$75,000.00.  In addition to Plaintiff's actual damages, the amount-in-controversy

includes multipliers of damages, such as the treble damages provision in M.G.L. c.

93A.  Attorney fees must also be considered if they are authorized by statute—as

they are by M.G.L. c. 93A.  Given these factors, from a review of the Second

Amended Complaint, it is facially apparent that Plaintiff has sufficiently alleged

damages over the jurisdictional amount.

## ARGUMENT

A.    **The Law requires treating good faith allegations as sufficient unless the amount in controversy is "immeasurable" or "speculative".**

As the Supreme Court explained in *St. Paul Mercury Indemnity Co. v. Red*

*Cab Co*., 303 U.S. 283, 288-289 (1938):

> The rule governing dismissal for want of jurisdiction in cases brought in federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith.  It must appear to a **legal certainty** that the claim is really for less than the jurisdictional amount to justify dismissal. (emphasis added).

A plaintiff's allegations regarding the amount in controversy is accepted if made in

good faith. *Dart Cherokee Basin Operating Co., LLC. v. Owens*, 574 U.S. 81, 135

S. Ct. 547, 553 (2014); see also *Fastcase v. Lawriter*, 907 F. 3d 1335, 1342 (11th

Cir. 2018).  Generally, the court should defer to the value the plaintiff places on his

claim and "[i]t must appear to a legal certainty that the claim is really less than the

jurisdictional amount to justify dismissal". *Federated Mut. Ins. Co. v. McKinnon Motors, LLC.*, 329 F. 3d. 805, 807 (11th Cir. 2013) citing *Red Cab Co*. 303 U.S. at 289, 58 S. Ct. at 590. "The determination of whether the requisite amount in controversy exists is a federal question; however, state law is relevant to this determination insofar as it defines the nature and extent of the right plaintiff seeks to enforce". *Broughton v. Fla. Int'l Underwriters, Inc*., 139 F.Ed 861, 863 (11th Cir. 1998).

Plaintiff has stated in his second amended complaint that he is seeking damages in excess of $500,000.00.  In support of this claim, Plaintiff has alleged that as a direct and proximate result of Defendants' unscrupulous business practices, Plaintiff suffered extreme emotional distress including intense worry, sleeplessness, interference with sleep, exacerbation of his chronic pain and sleep disturbance and increased daytime somnolence—all requiring him to increase his medications and supplements.  Given the frequency of the calls and the fact that Plaintiff was repeatedly threatened with lawsuits and criminal prosecution, that Plaintiff suffered this manner and intensity of emotional injury is not hard to understand.

Plaintiff has further alleged that he suffered an invasion of his right to privacy and was defamed.  By taking the action of usurping Plaintiff's name and number to "slam" and "cram" the elderly, Tele Circuit broadcasted to thousands of

15

consumers that Plaintiff was personally involved with Tele Circuit's illegal and unethical business practices and personally responsible for its illegal and harassing telemarketing. This conduct subjected Plaintiff to the scorn, hatred, ridicule and contempt of at least hundreds of persons in at least six states and has forced him to live under the constant threat of civil and criminal legal action against him.

Based on the foregoing, Plaintiff submits that his damages are neither immeasurable or speculative. His valuation of his claim was made in good faith and there is no evidence on the record to support a conclusion to a legal certainty that his claims are "really for less than the jurisdictional amount."

**B.     It is facially apparent from a review of the second amended complaint that the amount in controversy is satisfied**.

In the event that this Court determines that Plaintiff's claim for damages is indeterminate, it is facially apparent from the second amended complaint that the amount in controversy exceeds the jurisdictional amount. See *Williams v. Best Buy Co.*, 269 F. 3d 1316, 1319 (11th Cir. 2001); *Lowery v. Ala. Power Co.*, 483 F. 3d 1184, 1211 (11th Cir. 2007) ("[I]f the jurisdictional amount is either stated clearly on the face of the documents before the court, or ready deducible from them, then the Court has jurisdiction"). As noted above, as a result of Defendants' outrageous conduct, Plaintiff has suffered annoyance, anxiety, fearfulness and severe emotional distress with physical manifestations. Defendants' conduct is despicable, the harm that Plaintiff suffered is severe, and there is little doubt that a

16

reasonable jury could award Plaintiff the amount that he seeks.  In fact, juries have

routinely awarded plaintiffs in invasion of privacy actions and defamation actions

with lesser showings of emotional injury well in excess of $75,000.00.  See *Cheng*

*M.D. v. Romo M.D.*, 1:11cv10007, 2013 WL 4573093, (D. Mass. April 26,

2013)(awarding plaintiff $400,000.00 for invasion of privacy); *Frissore v.*

*Schondelmeyer* 1481CV07440, 2019 WL 1761641 (Mass. Super. Jan. 14,

2019)(awarding damages for defamation in the amount of $500,000.00 with no

demonstration of emotional distress); *Sindi v. Samia El-Mouslimany* 13-cv-10798,

2016 WL 6068370 (D. Mass. July 20, 2016) (awarding plaintiff $400,000.00 for

defamation and $100,000.00 for intentional infliction of emotional distress)[6];

*Maseritz v. Masertiz*, No. 02-C-2010-157110-IT (Md. Cir. Ct. Mar. 23, 2012)

(awarding plaintiff $1,500,000.00 for defamatory statements by ex-husband).

## C.    Treble damages and attorney fees under M.G.L. c. 93A.

### 1.    Massachusetts General Laws c. 93A

In Massachusetts, M.G.L. c. 93A, § 2(a) makes unlawful any "[u]nfair or

deceptive acts or practices in the conduct of any trade or commerce." G.L. c. 93A,

§ 2(a).  Chapter 93A is "a statute of broad impact which creates new substantive

rights and provides new procedural devices for the enforcement of those rights."

---

[6] Copies of the verdicts rendered in the Massachusetts cases cited are attached
herewith collectively as Exhibit A.

*Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975). The relief available under c. 93A is "sui generis". It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action." *Id*. at 704. It "mak[es] conduct unlawful which was not unlawful under the common law or any prior statute." *Commonwealth v. DeCotis*, 366 Mass. 234, 244 n. 8 (1974). Thus, a cause of action under c. 93A is "not dependent on traditional tort or contract law concepts for its definition." *Heller v. Silverbranch Constr. Corp.*, 376 Mass. 621, 626 (1978).

Massachusetts General Laws c. 93A, § 2, makes unlawful any unfair or deceptive acts or practices in the conduct of any trade or commerce. Section 9 of the chapter confers a private cause of action upon individuals suffering loss as a result of such prohibited practices. G.L. c. 93A, § 9. To succeed in making such a claim, a consumer must show: (1) an unfair or deceptive act or practice committed by the business; (2) a loss or injury; and (3) a causal connection between the deceptive act or practice and that loss or injury. See *Iannacchino v. Ford Motor Co.*, 451 Mass. at 629, 888 N.E.2d 879; *Casavant v. Norwegian Cruise Line Ltd.*, 460 Mass. 500, 503, 952 N.E.2d 908 (2011)[7].

---

[7] Under M.G.L. c. 93A, corporate officers, like Defendant Syed, may likewise be held directly liable for the damages without needing to pierce the corporate veil. See *Nader v. Citron*, 372 Mass. 96, 360 N.E.2d 870 (1977) (abrogated on other grounds by, *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 888 N.E.2d 879 (2008)). A corporate officer may be liable under 93A for acts undertaken by the

A plaintiff may recover actual or nominal damages, whichever is greater, that are caused by the alleged Chapter 93A violations. See *Tyler v. Michaels Stores, Inc*., 464 Mass. 492, 501-02 (2013).  If a causal connection exists, a Chapter 93A claimant may recover whatever compensatory and consequential damages arise therefrom. *DiMarzo v. Am. Mut. Ins. Co*., 389 Mass. 85, 101 (1983); accord *Haddad v. Gonzalez*, 410 Mass. 855, 867 (1991); See *Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.,* 469 Mas. 813, 823, 830, 17 N.E. 3d 1066, 1076, 1081 (2014) (holding that actual damages under Chapter 93A comprise "all natural consequences" and "all foreseeable and consequential damages arising out of the conduct which violates the statute").  Damages under 93A may include recovery for personal injury and emotional distress. *Haddad v. Gonzalez*, 410 Mass. at 867; *In re Hart*, 246 B.R. 709, 736 (Bankr. D. Mass. 2000).

Chapter 93A provides for multiple damages under certain circumstances. Section 9(3) provides as follows:

> (3) At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall

---

officer for the corporation where the officer individually operated or controlled the corporation and had knowledge of unlawful acts, or where the officer personally participated in the unlawful conduct.  *Nadar v. Citron*, 372 Mass at 103; *Beninati v. Borghi*, 90 Mass. App. Ct. 556, 566, 61 N.E. 23d 476, 485 (2016); *Gallagher v. Roach*, 1982 Mass. App. Div. 279, 281 (1982); *Community Builders, Inc. v. Indian Motorcycle Associates, Inc.,* 44 Mass. App. Ct. 537. 560 (1998) (holding that a corporate officer may be held personally liable for his participation in unfair and deceptive practices).

19

be mailed or delivered to any prospective respondent. Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, **if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two**. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper.

(emphasis added)

Chapter 93A's multiple damages provisions are meant to impose penalties that vary based on the culpability or egregiousness of defendant's conduct and deter further such conduct. See *Kansallis Fin. Ltd. v. Fern*, 421 Mass. 659, 672 (1996); *Int'l Fid. Ins. Co. v. Wilson*, 387 Mass. 841, 853 (1983); *Hug v. Gargano Assocs., P.C.*, 76 Mass. App. Ct. 520, 526 (2010); see *Haddad v. Gonzalez,* 410 Mass. at 855 ("It is established that deterrence is an important goal of the multiple damages provisions of c. 93A").  Because the assessment of multiple damages is premised on a defendant's wrongful conduct, and not the amount of harm suffered by a plaintiff, the multiple damages authorized by M.G.L. c. 93A "are essentially punitive in

nature." *Darviris v. Petros*, 442 Mass. 274, 283–284, 812 N.E.2d 1188 (2004), quoting *McEvoy Travel Bur., Inc. v. Norton Co.*, 408 Mass. 704, 717, 563 N.E.2d 188 (1990).

As set forth above, a plaintiff in an action under Chapter 93A can recover up to three but not less than two times the amount of his or her actual damages in the event of knowing or willful violations or in the event that the defendant does not respond in good faith to a demand letter made pursuant to the statute.  Here, Plaintiff has specifically alleged that Defendants' repeated violations of Chapter 93A were both knowing and willful and further has alleged that Defendants failed to substantively respond to Plaintiff's demand letter.  Plaintiff has, therefore, made a facial showing that Plaintiff is entitled to multiple damages on both grounds.

As with punitive damages, the amount in controversy includes statutory multipliers of damages, such as the treble damages provision in M.G.L. c. 93A. See *Boyd v. Homes of Legend, Inc.,* 188 F. 3d 1294, 1299-1300 (11th Cir. 1999) (looking to state law to determine whether punitive damages were recoverable and thus could be counted toward the amount of controversy); see also *Law Office of Joseph J. Cariglia, P.C. v. Jelly*, 146 F. Supp. 3d 251, 254 (D. Mass. 2015); *Santos v. Preferred Mut. Ins. Co*., 21 F. Supp. 3d 111, 116 n. 2 (D. Mass. 2014); see e.g. *Holley Equip. Co. v. Credit Alliance Corp.,* 821 F. 2d 1531, 1535 (11th Cir. 1987) ("[P]unitive damages must be considered, [citations omitted] unless it is apparent. .

.that such cannot be recovered.").  In light of the facts of this case and the intent and effect of the Chapter 93A damage multiplier, Plaintiff is entitled to treble damages.

### 2.    Attorney Fees and Costs

The United States Supreme Court has established that attorney's fees may be included in meeting the amount in controversy requirement where governing law allows.  *Mo. State Life Ins. Co. v. Jones*, 290 U.S. 199 (1933); *Cohen v. Office Depot, Inc*. 204 F. 3d. 1069, 1079 (11th Cir. 2000), cert. denied, 531 U.S. 957 (2000) ("when a statutory cause of action entitles a party to recover reasonable attorney fees, the amount in controversy includes consideration of the amount of those fees); *Morrison v. Allstate Indem. Co*., 228 F. 3d 1255, 1265 (11th Cir. 2000). Chapter 93A authorizes recovery of attorney fees "incurred in connection with said action". M.G.L. c. 93A.  Indeed, as Massachusetts Courts have routinely recognized, "[t]he entire tenor of G.L. c. 93A is to award attorney's fees and costs to a party who succeeds in demonstrating that a defendant has violated G.L. c. 93A, § 2(a)." *Barron v. Fidelity Magellan Fund*, 57 Mass.App.Ct. 507, 517, 784 N.E.2d 634 (2003), quoting from *Commonwealth v. Fall River Motor Sales, Inc.,* 409 Mass. 302, 316, 565 N.E.2d 1205 (1991).  As Massachusetts Courts have explained, "[t]his is due to the fact that "[s]uch a view is consistent with 'the

scheme of the statute and the Legislature's manifest purpose of deterring misconduct.' " *Id.*

By way of his second amended complaint, Plaintiff has specifically requested an award of attorney fees in accordance with Chapter 93A.  As stated above, the amount of his attorney's fees and costs alone incurred to date in his ongoing prosecution of his claims exceeds the jurisdictional threshold.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully submits that Plaintiff's damages exceed the jurisdictional threshold.  In order to further support Plaintiff's position in this regard, Plaintiff requests that this Court set an evidentiary hearing so that Plaintiff can present testimony concerning the nature and extent of his damages.

ROBERT A. DOANE,
by his Attorney

/s/RICHARD B. REILING
RICHARD B. REILING BBO 629203
Bottone | Reiling
63 Atlantic Ave., 3rd Floor
Boston, MA 02110
Phone:     617-412-4291
Facsimile: 617-412-4406
richard@bottonereiling.com

And

/s/DAVID G. CHENG
DAVID G. CHENG (#762468)
260 Peachtree St. NW, Ste. 2200
Atlanta, GA 30303
Phone:        334-451-4346
davidganwingcheng@gmail.com

## LOCAL RULE 7.1D CERTIFICATION

I hereby certify that the foregoing complies with the font and point

requirements in that the foregoing was prepared in Times New Roman font, 14-

point type.

/s/RICHARD B. REILING ESQ.
Attorney at Law

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate of the foregoing

has been served upon counsel for Defendants by way of this Court's Electronic

Notification System this 18th day of August, 2022.

/s/RICHARD B. REILING
Attorney at Law

# EXHIBIT A

CHENG, MD v. ROMO, MD, JVR No. 1308070023 (2013)

JVR No. 1308070023, 2013 WL 4573093 (D.Mass.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West

United States District Court, D. Massachusetts.

CHENG, MD v. ROMO, MD

1:11CV10007
DATE OF FILING: January 04, 2011
DATE OF TRIAL: April 26, 2013

TOPIC:

LIABILITY:

General: Personal

Specific: Invasion of Privacy

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total Verdict: $400,000**
**Judge Reduced Award To: $**
HIGH AMOUNT: $0

LOW AMOUNT: $0

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Zachary W. Berk, Boston, MA
Peter S. Brooks, Boston, MA
Dawn M. Mertineit, Boston, N/A
Defendant: Joseph V. Cavanagh, Providence, RI
Karen A. Pelczarski, Providence, RI
Robert J. Cavanagh, Providence, RI
JUDGE: Denise J. Casper

RANGE AMOUNT: $200,000 - 499,999

STATE: Massachusetts
COUNTY: Not Applicable

**PRIMARY INJURY: General Emotional Distress: Invasion of Privacy**

**SUMMARY**

CHENG, MD v. ROMO, MD, JVR No. 1308070023 (2013)

**PLAINTIFF:**
Sex: Male

Age: Minor

General Occupation: Doctor

**DECEDENT:**
**DEFENDANT:**
Sex: Female

Age: Adult

Defendant general occupation: Doctor

Organization Type: Romo

Policy Limit: $

**DAMAGES:**
Compensatory Pain And Suffering Award: $400,000

Total Compensatory Award: $400,000

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Other Damages: $0

Interest: $0

Loss of Service: $0

Comparative Negligence Percentage: 0

**FACTS:**
David Cheng, MD, a radiologist, reported suffered emotional distress and an invasion of privacy as a result of defendant Laura Romo, MD, a radiologist and the plaintiff's business partner at non-party Advanced Radiology Inc., accessing his email from home using a password he had once given her only for work-related consulting issues and after workplace computer system changes did not require access to his email. The plaintiff contended the defendant knowingly and intentionally

CHENG, MD v. ROMO, MD, JVR No. 1308070023 (2013)

violated the Stored Communications Act, 18 U.S.C., Sect. 2701 et seq., and the Massachusetts Privacy Act, Mass. Gen. L. c. 214, Sect. 1B, when she accessed his email account, printed at least 10 emails and sent them to her husband, non-party John Romo, MD, an Advance Radiology administrator, some of which contained sexual overtones of a relationship Cheng had with another Advance Radiology employee. Even though a business employee manual stated that internet usage was subject to monitoring at any time and that online communication and internet use during business hours were considered private, the plaintiff stated he never signed an acknowledgment receipt of the manual, the manual did not apply to the business owners and that employees were permitted to use their work computers for personal email. The plaintiff further contended the defendant secretly recorded a meeting with partners at Advanced Radiology and two conversations with an employee. The defendant admitted accessing the plaintiff's email account no less than five times without telling him but otherwise denied liability. The defendant contended she became aware of self-dealing and secrecy in the management of Advanced Radiology and she and John as business partners had questioned the handling of $4,000,000 in receivables but received no answers. Moreover, shortly after John had walked in on Cheng having a sexual act with an employee, he was put on probation after having a verbal exchange with the employee. The defendant further contended the plaintiff voluntarily gave her his password and unfettered authority to access his account, that after months of being cut out of conversations with other shareholders and her husband's job wrongly threatened, she had legitimate reasons for seeking information and that her actions that were supported by provisions in the company policy manual. Jurors determined the defendant violated both acts and awarded the plaintiff $200,000 for actual damages, $50,000 for damages related to unauthorized access and $150,000 for dissemination of emails from his account.


Jury Verdict Research
COURT: USDC

**End of Document**                                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

FRISSORE v. SCHONDELMEYER; RUSSIAN, JVR No. 1907150065 (2019)

JVR No. 1907150065, 2019 WL 3883582 (Mass.Super.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West

Superior Court of Massachusetts, Middlesex County.

FRISSORE v. SCHONDELMEYER; RUSSIAN

1481CV07440

DATE OF INCIDENT: May 18, 2014
DATE OF FILING: July 07, 2016
DATE OF TRIAL/SETTLEMENT: January 14, 2019

TOPIC:

LIABILITY:

General: Personal

Specific: Slander

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total: $500,000**

**Related Court Documents:**
Plaintiff's first amended complaint: 2016 WL 11590617

Defendant's proposed jury instructions: 2018 WL 8244451

Plaintiff's proposed jury instructions: 2019 WL 2027491

Verdict form: 2019 WL 2028525

Judgment: 2019 WL 2062619

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff:
Leonard H. Kesten, Brody, Hardoon, Perkins & Kesten L.L.P., Boston, MA
Michael Stefanilo, Brody, Hardoon, Perkins & Kesten L.L.P., Boston, MA
Defendant:
Douglas L. Price, Morrison Mahoney L.L.P., Boston, MA
Brian J. Manikowski, Mahoney Morrison L.L.P., Boston, MA
JUDGE: Kenneth J. Fishman

FRISSORE v. SCHONDELMEYER; RUSSIAN, JVR No. 1907150065 (2019)

RANGE AMOUNT: $500,000 - 999,999

STATE: Massachusetts
COUNTY: Middlesex

**PRIMARY INJURY: Defamation: Slander**

**SUMMARY**
**PLAINTIFF:**
Sex: M

Age: Adult

General Occupation: Police Officer

**DEFENDANT:**
Sex: M

Age: Adult

General Occupation: Veterinarian

Organization Type: Schondelmeyer

Sex: M

Age: Adult

Organization Type: Russian

**DAMAGES:**
Compensatory Pain & Suffering: $500,000

Total Compensatory Award: $500,000

Comparative Negligence Percentage: 0

**FACTS:**
John Frissore, a male police officer, reportedly suffered damage to his reputation, emotional stress and humiliation due to defamatory statements made to the press by defendants Curtis W. Schondelmeyer and Scott Russian, including that the plaintiff consistently used his cellphone while directing traffic, thereby causing him to be distracted, after he had cited defendant Schondelmeyer for distracted operation of a motor vehicle. According to the plaintiff, defendant Schondelmeyer was driving a vehicle in an eastbound lane on a city street when he reached out his right hand while holding his cell phone and took a picture of the plaintiff, who was directing traffic, and the plaintiff subsequently mailed defendant Schondelmeyer

FRISSORE v. SCHONDELMEYER; RUSSIAN, JVR No. 1907150065 (2019)

a citation for distracted operation of a vehicle. The plaintiff maintained that the next day, defendant Schondelmeyer called the police department and complained to a police sergeant that the plaintiff was consistently using his cellphone while directing traffic and that he took the picture of the plaintiff to show him doing so. The plaintiff also claimed that several days later, defendant Schondelmeyer supplied an affidavit to the police sergeant in which he alleged that the plaintiff had issued the citation to him in retaliation for his complaint made to the police department, and that defendant Russian supplied an affidavit in which he stated he was driving the vehicle and defendant Schondelmeyer was a passenger when Schondelmeyer took the plaintiff's picture, and that the plaintiff was so distracted by his cell phone, that he did not notice that defendant Schondelmeyer was the passenger and not the driver. The plaintiff further maintained that the defendants were subsequently featured in a TV news story in which they made the same defaming statements about him, and that he was further defamed by the defendants when the TV station aired a second story regarding the incident based on defendant Schondelmeyer's appeal of his citation to the District Court. The defendants disputed the plaintiff's claims. A jury found for the plaintiff and awarded damages of $400,000, to be paid by defendant Schondelmeyer, and $100,000, to be paid by defendant Russian.


Jury Verdict Research
COURT: Superior

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Hayat SINDI, Plaintiff, v. Samia EL-MOSLIMANY, and Ann..., 2016 WL 6394089...

2016 WL 6394089 (D.Mass.) (Verdict, Agreement and Settlement)
United States District Court, D. Massachusetts.

Hayat SINDI, Plaintiff,

v.

Samia EL-MOSLIMANY, and Ann El-Moslimany, Defendants.

No. 1:13-CV-10798-IT.
July 21, 2016.

**Special Jury Verdict form**

*Plaintiff's Claim for Defamation Against Samia El-Moslimany*

l(a). Do you find that the Plaintiff has proved by a preponderance of the evidence that (i) Samia El-Moslimany *published a statement* (or statements) of and concerning Dr. Sindi, (ii) that the statement *(or statements) about Dr. Sindi were false and defamatory* and (iii) the defamatory statement (or statements) either *caused Plaintiff economic loss or is of the type that is actionable without proof of economic loss?*

Yes X                                     No _____

If you answered Question l(a) YES then proceed to Question l(b).

If you answered Question l(a) NO then proceed to Question 2(a).

l(b). Do you find by clear and convincing evidence that Samia El-Moslimany published the defamatory statement (or statements) with knowledge that it was false or *with reckless disregard of whether it was false or not?*

Yes X                                     No _____

If you answered Question l(b) YES then proceed to Question 1(c).

If you answered Question l(b) NO then proceed to Question 2(a)

l(c). What amount of money, if any, will fairly compensate the plaintiff for her injury or damages caused by Samia El-Moslimany defaming the plaintiff?

$ 400,000 (write in figures)

Four hundred thousand dollars (write in words)

Please proceed to Question 2(a).

Hayat SINDI, Plaintiff, v. Samia EL-MOSLIMANY, and Ann..., 2016 WL 6394089...

*Plaintiff's Claim for Intentional Interference with Contractual Relationships Against Samia El-Moslimany*

2(a). Do you find by a preponderance of the evidence that Samia El-Moslimany intentionally interfered with plaintiff's *contractual relationships?*

Yes X                                    No _____

If you answered NO to Question 2(a) then proceed to Question 3(a).

If you answered YES to Question 2(a) then proceed to Question 2(b).

2(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a result of Samia El-Moslimany interfering with the plaintiff's contractual relationships?

Yes X                                    No _____

If you answered NO to Question 2(b) then proceed to Question 3(a).

If you answered YES to Question 2(b) then proceed to Question 2(c).

2(c). What amount of money will fairly compensate the plaintiff for her injuries or damages which were caused by Samia El-Moslimany's interfering with the plaintiff's contractual relationships?

$ 2,000,000 (write in figures)

Two million dollars (write in words)

Please proceed to Question 3(a).

*Plaintiff's Claim for Intentional Interference with Prospective Business Relations Against Samia El-Moslimany*

3(a). Do you find by *a preponderance of the evidence* that Samia El-Moslimany intentionally interfered with the plaintiff's *prospective business* relationships?

Yes X                                    No _____

If you answered NO to Question 3(a) then proceed to Question 4(a).

If you answered YES to Question 3(a) then proceed to Question 3(b).

3(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a result of Samia El-Moslimany interfering with the plaintiff's prospective business relationships?

Yes X                                    No _____

If you answered NO to Question 3(b) then proceed to Question 4(a).

If you answered YES to Question 3(b) then proceed to Question 3(c).

3(c). What amount of money will fairly compensate the plaintiff for her injuries or damages which were caused by Samia El-Moslimany interfering with the plaintiff's prospective business relationships?

$ 400,000 (write in figures)

Four hundred thousand dollars (write in words)

Please proceed to Question 4(a).

*Plaintiff's Claim for Intentional Infliction of emotional Distress Against Samia El-Moslimany*

4(a). Do you find by a preponderance of the evidence that *Samia El-Moslimany intentionally caused the plaintiff to suffer severe emotional distress?*

Yes X                          No _____

If you answered NO to Question 4(a) then proceed to Question 5(a).

If you answered YES to Question 4(a) then proceed to Question 4(b).

4(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a result of Samia El-Moslimany causing the plaintiff to suffer severe emotional distress?

Yes X                          No _____

If you answered NO to Question 4(b) then proceed to Question 5(a).

If you answered YES to Question 4(b) then proceed to Question 4(c).

4(c). What amount of money will fairly compensate the plaintiff for her injuries or damages which were caused by Samia El-Moslimany causing the plaintiff to suffer severe emotional distress?

$ 100,000 (write in figures)

One hundred thousand dollars (write in words)

Please proceed to Question 5(a).

*Plaintiff's Claim for Defamation Against Ann El-Moslimany*

5(a). Do you find that the Plaintiff has proved by a preponderance of the evidence that (i) Ann El-Moslimany published a statement (or statements) of and concerning Dr. Sindi, (ii) that the statement (or statements) about Dr. Sindi were false and defamatory and (iii) the defamatory statement (or statements) either caused Plaintiff economic loss or is of the type that is actionable without proof of economic loss?

Yes X                                                        No _____

If you answered Question 5(a) YES then proceed to Question 5(b).

If you answered Question 5(a) NO then proceed to Question 6(a).

5(b). Do you find by clear and convincing evidence that Ann El-Moslimany published the defamatory statement (or statements) with knowledge that it was false or with reckless disregard of whether it was false or not?

Yes X                                                        No _____

If you answered Question 5(b) YES then proceed to Question 5(c).

If you answered Question 5(b) NO then proceed to Question 6(a)

5(c). What amount of money, if any, will fairly compensate the plaintiff for her injury or damages caused by Ann El-Moslimany defaming the plaintiff?

$ 100,000 (write in figures)

One hundred thousand dollars (write in words)

Please proceed to Question 6(a).

*Plaintiff's Claim for Intentional Interference with Contractual Relationships Against Ann El-Moslimany*

6(a). Do you find by a preponderance of the evidence that Ann El-Moslimany intentionally interfered with plaintiff's contractual relationships?

Yes X                                                        No _____

If you answered NO to Question 6(a) then proceed to Question 7(a).

If you answered YES to Question 6(a) then proceed to Question 6(b).

6(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a result of Ann El-Moslimany interfering with the plaintiff's contractual relationships?

Yes X                                                        No _____

If you answered NO to Question 6(b) then proceed to Question 7(a).

If you answered YES to Question 6(b) then proceed to Question 6(c).

6(c). What amount of money will fairly compensate the plaintiff for her injuries or damages which were caused by Ann El-Moslimany's interfering with the plaintiff's contractual relationships?

$ 400,000 (write in figures)

Four hundred thousand dollars (write in words)

Please proceed to Question 7(a).

*Plaintiff's Claim for Intentional Interference with Prospective Business Relations Against Ann El-Moslimany*

7(a). Do you find by a preponderance of the evidence that Ann El-Moslimany intentionally interfered with the plaintiff's prospective business relationships?

Yes X                          No _____

If you answered NO to Question 7(a) then proceed to Question 8(a).

If you answered YES to Question 7(a) then proceed to Question 7(b).

7(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a result of Ann El-Moslimany interfering with the plaintiff's prospective business relationships?

Yes X                          No _____

If you answered NO to Question 7(b) then proceed to Question 8(a).

If you answered YES to Question 7(b) then proceed to Question 7(c).

7(c). What amount of money will fairly compensate the plaintiff for her injuries or damages which were caused by Ann El-Moslimany interfering with the plaintiff's prospective business relationships?

$ 100,000 (write in figures)

One hundred thousand dollars (write in words)

Please proceed to Question 8(a).

*Plaintiff's Claim for Intentional Infliction of Emotional Distress Against Ann El-Moslimany*

8(a). Do you find by a preponderance of the evidence that Ann El-Moslimany intentionally caused the plaintiff to suffer severe emotional distress?

Yes X                                        No \_\_\_\_\_

If you answered NO to Question 8(a), you have completed the Verdict Slip.

If you answered YES to Question 8(a) then proceed to Question 8(b).

8(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a result of Ann El-Moslimany causing the plaintiff to suffer severe emotional distress?

Yes \_\_\_\_\_                                        No X

If you answered NO to Question 8(b), you have completed the Verdict Slip.

If you answered YES to Question 8(b) then proceed to Question 8(c).

8(c). What amount of money will fairly compensate the plaintiff for her injuries or damages which were caused by Ann El-Moslimany causing the plaintiff to suffer severe emotional distress?

$ _____ (write in figures)

_____ (write in words)

*The foreperson of the jury should sign this verdict form in the space provided below. The foreperson should then inform the court security officer that the jury has reached a verdict. The foreperson will submit this verdict form to the deputy clerk in open court.*

I certify that the above answers represent the unanimous verdict of the all of the jurors.

<<signature>>

Foreperson

7/20/2016

Date

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.